**SHAFFER OIL & REFINING CO. v. TIPPETT PIPELINE CO.**

No. 14906—Opinion Filed Feb. 9, 1926.

Rehearing Denied Feb. 22. 1927.

**1. Contracts—Alteration by Executed Oral Agreement.**

A written contract may be altered by an executed oral agreement.

**2. Same—Recognition of Alteration by Acts —Extension of Altered Contract by Subsequent Writing.**

Where a contract has been altered by an executed oral agreement and the parties' have complied with the contract, as altered, for a term of years, and thereafter enter into another written contract, relating to the same matters, by the recitals of which it is recognized that the written contract has been complied with up to that time, and the later contract expressly extends in force the original written contract, it thereby extends in force the original contract as altered by the executed oral agreement.

**3. Injunction—Remedy at Law for Breach of Contract.**

Where the plaintiff has a plain and adequate remedy at law for the breach of a contract, injunction will not lie to prevent its breach.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court. Payne County; Charles C. Smith, Judge.

Action by Tippett Pipeline Company against Shaffer Oil & Refining Company. Judgment for plaintiff, and defendant appeals. Reversed, with directions.

Rainey & Flynn, and Calvin Jones (Cummins, Roemer & Flynn and R. M. Campbell, of counsel), for plaintiff in error.

A. Carey Hough and George A. Henshaw. for defendant in error.

Opinion by RAY, C. In 1912 C. B. Shaffer owned oil and gas leases covering approximately 50,000 acres in Creek, Payne and Lincoln counties, on one of which leases a gas well of approximately 40,000,000 cubic feet daily production had been developed. Having no market for the gas Shaffer entered into a written contract with W. J. Rowland, by the terms of which Rowland agreed to purchase the gas produced at the particular well and from any and all other wells thereafter to be developed on any of the leases then owned by Shaffer, or thereafter acquired by him, within the three counties. By the terms of that contract Shaffer agreed to lay branch lines, not to exceed 2,500 feet in length, equipped with necessary drips and appliances to deliver dry gas in a marketable condition into Rowland's pipe line. For the gas so furnished, dry and delivered into Rowland's pipe line, he agreed to pay Shaffer 2c per 1,000 cubic feet, and as much more per 1,000 feet at any time as was being paid to any other producer of gas in Creek county, under conditions specified in the contract. The contract provided that it should continue in force and be binding upon the parties, their heirs, executors, administrators, successors and assigns. for a period of five years, or as long thereafter as gas should be produced from the

wells. In 1913 they entered into a supplemental contract which provided that in the event the wells drilled, or to be drilled, by Shaffer failed to furnish a sufficient quantity of gas to enable Rowland to fulfill his contracts, Rowland should have the right to enter upon the leased premises of Shaffer and drill for natural gas within certain limitations not necessary to be considered here. At the commencement of operations under the 1912 contract the parties laid the pipe lines in conformity to that contract, that is, Shaffer laid the branch lines connected with the wells, supplied with drips and delivered the gas into Rowland's pipe lines, but as new gas wells were brought in and business increased and new markets were developed by Rowland for the gas, to the extent that Rowland was preparing to lay pipe lines into Kansas and Missouri, the parties concluded that confusion and trouble might arise between them in determining what particular lines should be laid by Shaffer, and what lines should be laid by Rowland, and, in case of an abandoned well, there would be difficulty in determining what pipes belonged to Shaffer and what pipes belonged to Rowland. To obviate such possible confusion they entered into an oral agreement that Rowland should lay all the pipes to and connect them with the wells, put in the drips, and receive the gas at the wells, so that Shaffer would have no pipe line equipment whatever, and that Rowland should look after, care for the wells, and blow the drips. Pursuant to that agreement Rowland connected his pipes with the wells, and Shaffer was relieved of any duty or responsibility whatever in caring for the wells or in delivering the gas, except to produce it at the wells. About 1914 the Creek County Gas Company, by assignment, succeeded to all the interests of Rowland in and to these contracts; and some time later Shaffer assigned all his leases and his interests in these contracts to the Shaffer Oil & Refining Company.

April 19, 1920, the parties entered into another contract, the material parts of which are as follows:

"Whereas, on the 7th day of November, 1912, an agreement was entered into between C. B. Shaffer of Chicago, Ill., and W. J. Rowland of Pittsburgh, Pa., which agreement was modified and amended in an agreement between said Shaffer and Rowland on the 13th day of October, 1913, under the terms of both of which the said Rowland was to purchase all of the gas produced upon all of the acreage then owned or thereafter acquired by said Shaffer in Creek, Payne and Lincoln counties, Okla., and, * * *

"Whereas, under the terms of these agree-

ments said second party has always afforded said Shaffer a constant and reliable market for all the gas that has been produced on said acreage at the current market price for gas, and,

"Whereas, the party of the first part hereto has acquired and is now the owner of all of the oil and gas lands and gas wells owned by said Shaffer in the counties named above and is delivering gas to the party of the second part under all of the terms and conditions of the contracts above referred to with said Rowland and which is constantly acquiring new acreage upon which gas wells may be drilled, and is desirous of obtaining a constant and reliable market for all of the gas it may produce in the counties named above and the party of the second part hereto is willing and desirous to purchase.

"Now, therefore, this agreement further witnesseth: That for and in consideration of the sum of $1, the receipt of which is hereby acknowledged, and of the premises and of the covenants and agreements and payments hereinafter mentioned under this contract to be well and truly kept, paid and performed by the party of the second part, the party of the first part covenants to and with the party of the second part to furnish, supply and deliver unto the said party of the second part, and the party of the second part agrees to purchase and pay for all of the natural gas that is now being produced or may hereafter be produced upon acreage now owned or hereafter acquired, directly or indirectly, at the current market price for gas at the well and under all of the terms and conditions embodied in the agreements dated November 7, 1912, and October 13, 1913, between C. B. Shaffer and W. J. Rowland, copies of which are attached hereto and made a part hereof as completely and as binding in their effect as though fully written herein. * * *"

Subsequent to the execution of the foregoing contract, control of the Shaffer Company was acquired by other interests. January 2, 1922, the Creek County Gas Company assigned all its interests in and to these contracts to the Tippett Pipeline Company, "in so far as the same affects all acreage lying north and south of the 8-inch pipe line running to Ripley, Okla." The territory designated in this assignment included the lease on which the well known as Duncan No. 6, in Payne county, being the well involved in this litigation, is located. When this well was brought in, and while the Tippett Pipeline Company was preparing to connect its lines with the well, but before it had done so, the Shaffer Oil & Refining Company laid a branch line, put in the necessary drips and connected its branch lines with the Tippett Company's pipe line, and notified the Tippett Pipeline

Company, in substance, that it would install a compression or stripping plant at the well, and extract the gasoline content from the natural gas as it came from the well, and deliver stripped gas into the plaintiff's pipe line under its contract. The Tippett Pipeline Company commenced this suit to enjoin the Shaffer Oil & Refining Company from installing the stripping plant at the well and from stripping the gasoline content from the natural gas before delivering the gas into its pipe line. A temporary injunction was granted, and on final hearing made permanent. The Shaffer Oil & Refining Company has appealed. Parties will be referred to as the Shaffer Company and the Tippett Company.

The controversy arises over the interpretation of these several contracts. The Shaffer Company contends that by section 13 of the 1912 contract the right to take the gasoline content from the natural gas before delivering the gas into the Tippett Company's pipe line was expressly reserved, while the Tippett Company contends that such reservation extended only to casinghead gas, and in case the casinghead gas should prove insufficient for fuel purposes in the manufacture of gasoline from the casinghead gas coming from the oil well, then a sufficient amount of the natural gas coming from the gas wells should be used by the Shaffer Company for fuel in the manufacture of gasoline from the casinghead gas and in field operations. That section reads as follows:

"13. The party of the first part hereby covenants and agrees that he will not dispose of the gas from any leaseholds of his ownership, as hereinbefore described, to any other party or parties, firm, corporation, or otherwise to use the product from his well or wells, except that reservation is hereby made to said first party of all casinghead gas; if the casinghead gas is not sufficient in quantity to supply the requirements of the party of the first part for gasoline manufacturing purposes and for conducting lease operations, then the said first party may have the right to use a sufficient amount of gas from the gas wells on his own properties to meet the requirements for gasoline manufacturing purposes and lease operations."

It is conceded by the Tippett Company that all casinghead gas, that is, gas coming from oil wells, was reserved by Shaffer, but that natural gas coming from a gas well is not casinghead gas. Westcott, generally recognized as an authority on the subject, in his Handbook on Casinghead Gas (Edition of 1922) page 6, says:

"Throughout this book the expression 'casinghead gas wells' refers to oil wells flowing casinghead gas They are distinct from a natural gas well, as they do not supply gas alone, but a combination of gas and oil."

It is further made apparent by the supplemental contract of 1913 that Shaffer was not selling anything from the oil wells. In that contract it was agreed that if the wells drilled by Shaffer did not furnish sufficient gas to enable Rowland to meet his contracts, then Rowland should have the right to go on Shaffer's leases and drill for gas, but, if he should develop an oil well, and Shaffer did not elect to pay the cost of drilling the well and take it over, Rowland was required to plug the well, which, of course, would prevent his taking anything from it. The Tippett Company also concedes the right of the Shaffer Company, under this reservation, to use whatever gas is necessary when the casinghead gas shall prove insufficient in quantity for lease operations; that is, for heat, light, and power on the leases developed or being developed. The question at issue is, under the wording of the reservation, has the Shaffer Company the right, at any time it may desire to manufacture more gasoline than could be made from the casinghead gas, to strip the gasoline content from the natural gas coming from the gas wells to be manufactured into gasoline, and to deliver the stripped gas into Tippett's pipe line?

It is clear the contract was to sell the gas from the gas wells, reserving only the right to use a sufficient quantity for a particlar purpose named, in the event that the casinghead gas should not be sufficient in quantity for that purpose. There is nothing in the language to indicate that it was the intention of the parties to reserve to Shaffer the right to take any ingredient or constituent part of the gas coming from the gas wells from it and deliver the remainder into the pipe line. The contract was for the sale of gas coming from the wells. If gas be taken from the well for use in lease operations it could only be for heat, fuel, and power. If used for that purpose it would be totally consumed. If taken and used for fuel, light, or power in the manufacture of gasoline from casinghead gas, it would be totally consumed the same as if used for lease operations. If the gasoline content be stripped from the natural gas, and the stripped gas be delivered into the Tippett pipe line, then we think that is not a use of the gas in the sense the word is used in the reservation, but is a refusal to deliver a constituent part of the natural gas as it comes from the well.

The real contention of the Shaffer Company is that the right to extract the gasoline content does not rest upon a contingency expressed by the language but upon the purpose for which it should be used, "to meet the requirements for gasoline manufacturing purposes," and that the requirements for gasoline manufacturing purposes are such as permit the extraction of the gasoline content from all the gas produced. We think the language of section 13 does not justify such an interpretation. We think such interpretation is also inconsistent with the interpretation placed upon it by the parties themselves for more than ten years, and inconsistent with the 1920 contract. By the 1912 contract Shaffer was to lay the branch line and deliver dry gas into Rowland's main line. By the oral agreement of 1914, Shaffer was relieved of that obligation, and Tippett laid his lines to and connected them with the wells and received the gas as it came from the wells. It was so receiving it at the time of the execution of the 1920 contract. That was an oral agreement fully executed, and to that extent altered the written contracts.

Section 5081, Comp. Stat. 1921, provides:

"A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

Section 5045, Comp. Stat. 1921, provides:

"Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

The 1920 contract recites:

"Whereas, the party of the first part hereto (the Shaffer Oil & Refining Company) has acquired and is now the owner of all oil and gas lands and gas wells owned by said Shaffer in the counties named above and is delivering gas to the party of the second part under all of the terms and conditions of the contract above referred to with said Rowland, and is constantly acquiring new acreage upon which gas wells may be drilled, and is desirous of obtaining a constant and reliable market for all of the gas it produces in the counties named above, and the party of the second part hereto is willing and desirous to purchase the same.

"The party of the first part then covenants to furnish, supply, and deliver to the said party of the second part, and the said party of the second part agrees to purchase and pay for all of the natural gas that is now being produced or may hereafter be produced upon acreage now owned or hereafter acquired, directly or indirectly, at the current market price for gas at the wells and under all of the terms and conditions embodied in the agreements dated November 7, 1912, and October 13, 1913. * * *"

While no direct reference is contained in this contract to the executed oral agreement, it does recite a condition brought about by the executed oral agreement and not embodied in either of the written contracts. Under the written contracts of 1912 and 1913, Shaffer was to deliver gas into Rowland's pipe lines, but, pursuant to the oral agreement, Rowland laid his branch lines to the wells and thereafter took the gas at the wells, and the Tippett Company was so receiving it at the time of the execution of the 1920 contract, in which it is recited that the first party "is delivering gas to the party of the second part under all of the terms and conditions of the contracts above referred to," and that the first party agrees to furnish, supply, and deliver, and the second party agrees to purchase and pay for, all the natural gas that is now being produced or may be produced at the current market price for gas at the well. To that extent, it must be held that by the 1920 contract it was recognized that the contracts of 1912 and 1913 had been modified to the extent that the Tippett Company should receive the gas into its branch lines at the well instead of being delivered by the Shaffer Company into the Tippett Company's line. These provisions of the contract, that the gas should be delivered and received as it was at the time being delivered and received at the well, and to be paid for at the market price at the well, are wholly inconsistent with the interpretation contended for by the Shaffer Company. The provisions of the several contracts above pointed out, taken together, negative the right of the Shaffer Company to install a stripping plant between the well and point of delivery and to deliver stripped gas at a point other than at the well.

The next question to be considered is whether the remedy of injunction is available to the plaintiff. It is made to appear by the testimony of W. H. Tippett, president and general manager of the Tippett Company, that he was not buying stripped gas for the reason that there was such a supply of raw gas that he could get all of the raw gas he needed. It is made to appear by the 1920 contract that there is a market in that community for raw gas at the well. It was specifically provided by that contract that the Tippett Company should pay, and the Shaffer Company should accept, the current market price for gas at the well. It being established that there is a recognized market price for gas at the well in the field where the well known as Duncan No. 6 is located, and that there is an abundant sup-

ply of gas for sale in that field, it is clear that the Tippett Company has a plain and adequate remedy at law, in an action for damages for breach of contract.

There is no suggestion here that the Shaffer Company is insolvent or unable to respond in damages. In such case, where plaintiff has a plain and adequate remedy at law, a breach of the contract will not be enjoined.

The contention for the Tippett Company, that it is or was in possession of the well in controversy, is not sustained by the evidence. The testimony of Tippett was that when he was preparing to connect his line with the well, that the Shaffer Company laid a branch line from the well to and connected it with the Tippett Company's line, and that it was in that condition at the time of the trial. We think the evidence shows that such was the condition at the time the Shaffer Company notified the Tippett Company of its intention to install a stripping plant and deliver stripped gas into the pipe line of the Tippett Company.

It is contended for the Tippett Company that it is entitled to injunctive relief for the reason that he has invested several hundred thousand dollars in pipe lines, and is engaged in delivering gas in large quantities under different contracts, and that the elements of its business are so complex and ramify in so many different directions, and are so interdependent that the disturbance or change of any one factor or set of factors, such as the source of plaintiff's gas or the condition in which it is delivered, so vitally affects its contract with other persons that refusal to deliver the gas would tend to disrupt its entire business fabric and destroy the value of its entire pipe line system, and the property and its investments therein.

No doubt if such condition were made to appear it would furnish grounds for equitable relief. But such is not the case. Only one well is involved here. Possession of that particular well has not been delivered to the Tippett Company, as the evidence shows. A supply of gas in that field sufficient to enable the Tippett Company to comply with its contract is available. It has a market value in that field as shown by the evidence. In such circumstances we do not think that the breach of the contract by Shaffer in his failure to deliver the gas from one particular well can be said to interfere with the Tippett Company's general business arrangement to such an extent as to entitle it to an injunction to prevent the breach of the contract.

We think the case of Galbraith Gas Co. v. Lindsey, 35 Okla. 235, 129 Pac. 45, is not in point. In that case Lindsey sought to enjoin the gas company from disconnecting its supply pipes from plaintiff's premises and from refusing to supply the same with gas for heating and lighting the residence, and running an engine situated on the premises and from pumping water in connection with the tenants, basing their right to the gas supply upon the alleged contract with the defendant. The court held that injunction must lie upon the ground that an irreparable injury was threatened.

The same may be said of Sickle v. Manhattan Gas & Light Co. (N. Y.) 64 How. Pr. 33. In that case the suit was to enjoin the company from removing the meter or cutting off the supply of gas from plaintiff's premises. It was held that injunction would lie to prevent irreparable mischief.

In the instant case, where the threatened breach of contract is the refusal to deliver gas coming from one well, the contract price of which is the current market value at the well, and there is an available supply to be had at the market value, and the defendant's inability to respond in damages was not alleged or proved, we think an irreparable injury is not threatened.

For the reasons stated, the judgment is reversed, with directions to dismiss the suit.

By the Court: It is so ordered.

Note.—See under (1) 13 C. J. p. 594 §601; 1 R. C. L. p. 999; 1 R. C. L. Supp. 305. (2) 13 C. J. p. 595 §615. (3) 32 C. J. p. 191 §289; 14 R. C. L. p. 383; 4 R. C. L. Supp. p. 900; 5 R. C. L. Supp. p. 762.